[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-10295
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 27, 2010
JOHN LEY
CLERK

D.C. Docket No. 0:08-cv-61255-WPD

ANDRE WATKINS,

Plaintiff-Appellant,

versus

SECRETARY DEPARTMENT OF HOMELAND SECURITY,
Janet Napolitano,
TRANSPORTATION SECURITY ADMINISTRATION,
601 South 12th Street
Arlington, VA 22202-4220,
ADMINISTRATOR, TRANSPORTATION SECURITY ADMINISTRATIVE,
601 South 12th Street
Arlington, VA 22202-4220
Kip Hawley,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 27, 2010)

Before BLACK, HULL and ANDERSON, Circuit Judges.

PER CURIAM:

Plaintiff Andre Watkins appeals pro se the district court's order granting

summary judgment to the defendants on his claims of race discrimination and

retaliation, brought pursuant to Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e-2(a), 2000e-3(a) ("Title VII").  After review, we affirm.[1]

## I.  BACKGROUND

Watkins, who is African American, worked as a security screener for the

Transportation Security Administration ("TSA") until he was terminated for being

absent without leave.  Watkins claims that TSA failed to promote him because of

his race and that he was terminated after he expressed his intention to file a

discrimination complaint.

## A.    Watkins's Employment with TSA

On September 2, 2002, Watkins began work as a TSA screener at the Fort

Lauderdale Airport ("FLL").  The first year of Watkins's employment was a

probationary period.  Because TSA was a new agency in the early stages of

---

[1]We review a district court's grant of summary judgment de novo.  Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007).  Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, presents no genuine issue of material fact.  Id.

federalizing security at FLL, Watkins began training other screeners within a few days of being trained and certified himself. Watkins worked the first shift, from 4:00 am to 12:30 pm, at Checkpoint Echo. According to Watkins, he trained many of the employees who were later promoted to supervisory positions and he often performed the duties of supervisors. He also contends that there were no African-American leads, supervisors or managers on the first shift at FLL.

Watkins's immediate supervisor was Cathy English, and his second-line supervisor was David Cassell, the acting Screening Manager at FLL. Cassell reported to Carmen Curro, the Concourse Manager, who reported to George Cruz, the Scheduling Operations Officer at FLL. Cruz's supervisor was Bryant Chevalier, the Assistant Federal Security Director at FLL.

Diane Barton was a TSA Human Resources Specialist. Barton was not in Watkins's chain of command. Rather, as part of her duties, Barton processed all requests for personnel action, including hiring, disciplinary action and termination, and prepared other paperwork for management. According to Barton, Watkins never applied for a promotion while employed with TSA.

## B.    TSA's Attendance Policy

Under TSA's written Attendance Control Policy, an employee is required to notify his supervisor within one hour of the start of his shift if he will be absent.

An employee who fails to notify his supervisor may be considered absent without leave, or AWOL. An employee who is AWOL three or more times is "reported up the chain of command with a recommendation for formal disciplinary action up to and including removal."

The Attendance Control Policy included progressive discipline for excessive absences (regardless of whether they were with leave), ranging from: (1) an initial, non-disciplinary discussion when there were six absences within a twelve-month period; (2) a Level I warning when seven absences occurred within a twelve-month period; (3) a Level II warning if another absence occurred within twelve months of the issuance of the Level I warning; and (4) a Level III issuance of a leave restriction letter if there was second absence within the same twelve-month period as the Level II warning or "if the offense is of an extremely serious nature such as an employee not notifying the supervisor when scheduled, (AWOL)" at which point the employee would be "immediately placed on Level III." The Level III portion of the Attendance Control Policy warned that "[e]mployees who are AWOL could face further disciplinary action to include termination."

Initially, TSA screeners at FLL notified their screening manager if they were going to be absent. Beginning in February or March 2003, TSA created an

4

Operations Center at FLL that employees were required to call to report being late or to request sick leave. Under the Attendance Control Policy, a supervisor could require an employee to provide a doctor's certification. Generally, TSA supervisors requested a doctor's note after three days of sick leave.

According to Bryant Chevalier, if a TSA employee had an attendance problem, the issue would be addressed initially with the employee's first-line supervisor and would proceed up through the levels of management, who worked with Human Resources to determine the appropriate course of action to take with respect to progressive discipline. If the problem continued, the issue would be taken to the Operations Manager (in this case, George Cruz), who would brief Chevalier on the issue. Whatever action Chevalier took "would be based on the information provided to [him] from the management team and HR."

## C. Watkins's Temporary Assignment in Key West

From October 30, 2002 to January 18, 2003, Watkins volunteered for a temporary assignment as a lead screener at Key West Airport. Watkins was one of sixteen TSA screeners from FLL assigned to help "roll out" security screening at Key West Airport. While in Key West, Watkins trained the newly hired TSA screeners and supervisors coming on board at the airport and performed many of the duties of supervisors. However, this temporary assignment was not a

5

promotion and did not result in a salary increase. Afterward, Watkins returned to his normal screening duties at FLL.

**D.     Watkins's Complaint to Barton**

Sometime in April or May of 2003, Watkins learned that his temporary assignment in Key West had not resulted in a promotion. Watkins called Barton in Human Resources for clarification and asked Barton why he did not receive a salary increase. Barton told Watkins his temporary assignment was not a promotion. Watkins responded that he intended to file an EEO discrimination complaint once his probationary period was over. Watkins did not file his complaint immediately because he "did not want to have any bruises on [his] record during [his] probation." It is undisputed that none of the supervisors in Watkins's chain of command was aware that he intended to complain of discrimination.

Diane Barton denies ever speaking with Watkins and avers that she was unaware that Watkins was African American or that he planned to file a race discrimination complaint. However, at summary judgment, we construe all facts in the light most favorable to Watkins. Thus, we assume Watkins told Barton he planned to complain of discrimination.

**E.     Watkins's Absences**

6

Between October 18, 2002 and July 23, 2003, Watkins was absent from work sixteen times. On July 29, 2003, George Cruz, as the "Proposing Official," signed a "Disciplinary Procedure Request Form" recommending Watkins's "[p]robationary removal." Cruz testified that he recommended Watkins's termination "due to [a] record of excessive absenteeism." The Disciplinary Request Form indicated that: (1) the reason for the requested action was "[o]ther (specify): AWOL"; and (2) Watkins's absences adversely affected business activity and employee moral because they "put a strain on operational needs" and caused "already short staffs to take up the slack."[2] On the same date, Barton in Human Resources forwarded the Disciplinary Procedure Request Form to Bryant Chevalier, who signed it as the "Concurring Official."

On August 1, 2003, Watkins did not report for work. Instead, Watkins, who was being treated for bronchitis, gave David Cassell, his second-line supervisor, a doctor's note indicating that he was on complete bed rest and could not return to work until August 8. By this time, Watkins had used all of his sick leave. Thus, Watkins requested and received annual leave for five days between August 3 and August 7, 2003. August 8 and 9 were Watkins's regular days off. However, on

[2]The Disciplinary Procedure Request Form stated that certain documents were attached, including a chronology of events, witness statements and Watkins's medical documentation and leave records; however, the copy in the record does not have the attachments.

August 10, 2003, Watkins did not report to work as expected.

Instead, from August 11 to August 15, 2003, Watkins called the Operations Center and reported that he was still sick and would be absent. Watkins did not submit a note to explain his continued absence after August 8. Starting August 10, Cassell made repeated attempts to contact Watkins, leaving messages on his cell phone and with his grandmother. Watkins testified that he did not return these calls because he was too sick to get out of bed and had turned his cell phone off.

On August 15, 2003, Watkins again called the Operations Center to report that he was sick. Watkins was told that he could no longer call into the Operations Center and needed to call Cassell. However, Cassell was off work until August 17.

On that date, Watkins called Cassell and told him that he was still sick and had returned to the doctor for more tests and a change in medication. Cassell responded that Watkins could not continue to call in sick and needed to provide documentation. Watkins gave Cassell his doctor's phone number and suggested the doctor could fax Cassell the required documentation and a new return-to-work date. Watkins later confirmed with the doctor's office manager that Cassell had called the doctor's office, but not whether the doctor gave Cassell the needed

documentation.[3]  Watkins never provided TSA with a doctor's note for any absences after August 8.

## F.     Watkins's Termination

On August 18, 2003, Cassell sent a memorandum to Barton in Human Resources documenting Watkins's attendance issues.  Cassell copied his supervisor, Carmen Curro.  Cassell stated that Watkins had exhausted all of his sick and annual leave and was AWOL on August 10 through August 14 and again on August 17 and 18.  Cassell had tried to contact Watkins on numerous occasions beginning August 10, to no avail.  Cassell recommended that Watkins's probationary employment be terminated.  Barton testified that, after receiving Cassell's memorandum, she would have contacted management, which would have included George Cruz and Bryant Chevalier.

A similar August 22, 2003 memorandum from Cathy English, Watkins's immediate supervisor, to George Cruz also documented Watkins's absences.  English's memorandum attached a copy of the Operations Center's attendance record for Watkins from July 22, 2003 to August 22, 2003, indicating Watkins was AWOL from August 12, 2003 onward.

---

[3]Cassell denies speaking with Watkins any time after August 8 or calling Watkins's doctor.

According to Bryant Chevalier, all termination decisions passed through his office. On August 29, 2003, Chevalier prepared a memorandum terminating Watkins's employment. Chevalier's memorandum stated: (1) "On October 18, 2002, January 14, February 28, March 29, May 4, 6, 16, & 17, June 8 & 15, July 9, 10, 11, 14, 22 & 23, [and] August 3, 4, 5, 6 & 7, 2003 you requested and were granted sick leave and annual leave in lieu of sick leave"; (2) Watkins was AWOL since August 8, 2003 and had not contacted TSA to request leave; (3) beginning on August 10, 2003, Watkins's supervisor had made numerous unsuccessful attempts to contact him; and (4) Watkins's extended AWOL was not compatible with employment with TSA.

Chevalier terminated Watkins based on his failure to come to work for the month of August. During deposition testimony, Chevalier acknowledged that on July 29, 2003, he received and signed the Disciplinary Request Form approving Watkins's probationary removal for being AWOL. Chevalier explained that while Watkins's supervisors had already "detected a problem in attendance" and recommended termination as early as July 29, 2003, Watkins was not formally charged with being AWOL until August 8, 2003.

## G. District Court Proceedings

Watkins pro se filed this action alleging that TSA violated Title VII by

10

denying him promotions based on his race and by terminating him in retaliation for his threat to file a race discrimination complaint. Watkins named as defendants Michael Chertoff, the Secretary of the Department of Homeland Security ("DHS"), and Kip Hawley, Administrator of TSA.[4] Watkins sought reinstatement with a position commensurate with his experience, back pay including sick and annual leave, and compensatory and punitive damages.

Following discovery, the defendants moved for summary judgment, arguing that Watkins had not established a prima facie case of either race discrimination or retaliation. The defendants also argued that they had articulated a legitimate, nondiscriminatory reason for terminating Watkins, namely his excessive absenteeism and AWOL status in mid-August.

The district court granted the defendants' motion for summary judgment, concluding that Watkins failed to establish a prima facie case of either race discrimination or retaliation. Watkins filed a motion for reconsideration, which the district court denied. Watkins filed this appeal.

## II. DISCUSSION

On appeal, Watkins challenges the district court's entry of summary

---

[4]Later, Janet Napolitano, current Secretary of DHS, was substituted for Michael Chertoff.

judgment on his discriminatory failure-to-promote and retaliation claims.[5]  Where, as here, a plaintiff relies on circumstantial evidence, we evaluate whether summary judgment is appropriate using the McDonnell Douglas framework.[6]  Combs v. Plantation Patterns, 106 F.3d 1519, 1527 (11th Cir. 1997).  If the plaintiff makes out a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions and then to the plaintiff to present evidence that the employer's reason is pretext for discrimination.  Id. at 1527-28; see also Crawford v. Carroll, 529 F.3d 961, 976 (11th Cir. 2008) (evaluating Title VII retaliation claims at summary judgment using the McDonnell Douglas framework).

## A.    Failure-to-Promote Claim

To establish a claim of discriminatory failure to promote, the plaintiff must present evidence that (1) he belongs to a protected class; (2) he applied for and was qualified for a promotion; (3) he was rejected for that promotion; and (4) an employee outside his protected class received the promotion.  Walker v. Mortham,

---

[5]It is unclear whether Watkins intended to bring a discriminatory discharge claim.  The district court addressed such a claim and concluded that Watkins had failed to establish a prima facie case.  Watkins does not challenge this ruling on appeal.  Rather, Watkins's brief focuses solely on whether he presented evidence of a discriminatory failure to promote him to a supervisor position.  Thus, we address only Watkins's failure-to-promote claim.

[6]McDonnell Douglas Corp v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).

12

158 F.3d 1177, 1186 (11th Cir. 1998). The plaintiff need not show he applied for a promotion to satisfy the prima facie case if the employer uses an informal promotion system that does not post openings or take applications Jones v. Firestone Tire and Rubber Co., Inc., 977 F.2d 527, 533 (11th Cir. 1992). Under these circumstances, the plaintiff need only show that the employer had some reason or duty to consider the plaintiff for the promotion. Id.

Here, Watkins failed to establish a prima facie case of failure to promote based on racial discrimination. As an African American, Watkins is a member of a protected class. Watkins points to his second-line supervisor, David Cassell, who is white, as an employee outside his protected class who was promoted to a supervisor position. Watkins claims that Cassell, like Watkins, started out as a screener and then was promoted to checkpoint manager and then checkpoint supervisor over another African-American lead screener, Alvin Tucker.

However, Watkins did not present any evidence of Cassell's two promotions or that Watkins himself applied for and was denied either position. Indeed, Watkins failed to present evidence that he applied for any other TSA position, except the temporary assignment as lead screener at the Key West airport, a

position that was not a promotion and which Watkins received.[7]  Furthermore,

Watkins has neither claimed nor shown that TSA used an informal means of

promoting employees such that he need not show he applied for a promotion.

Defendants, on the other hand, presented the sworn statement of Human

Resources Specialist Barton that Watkins never applied for a promotion while

employed by TSA.  Because Watkins failed to create a genuine issue of material

fact as to the second and third prongs of the prima facie case, the district court

properly granted summary judgment to the defendants on Watkins's failure-to-

promote claim.[8]

---

[7]Watkins's briefs in the district court and in this Court contain vague statements that he applied for TSA promotions.  To explain the lack of supporting documentation, Watkins states that he was not permitted to keep copies of his application documents and that the defendants removed the original documents from his personnel file.  None of these allegations were made under oath, and Watkins's unsworn statements in his briefs are not admissible evidence.  See Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005) (explaining that "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion").

[8]To the extent Watkins asserted a disparate impact discrimination claim or a pattern or practice discrimination claim, these claims fail.  At summary judgment, Watkins relied solely on the fact that there were no African American supervisors on his morning shift, and did not present the kind of statistical evidence that would show that TSA's promotion practices disproportionately impacted African American applicants.  See Spivey v. Beverly Enter., Inc., 196 F.3d 1309, 1314 (11th Cir. 1999) (explaining that prima facie case of disparate impact claim requires proof of causation by offering statistical evidence that a challenged employment practice had a disproportionate impact that resulted in discrimination); EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1273-74 (11th Cir. 2000) (explaining that a plaintiff may establish a pattern or practice claim by presenting strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class differently).  Moreover, as to the pattern or practice claim, Watkins did not seek declaratory or injunctive relief or establish himself as a class representative.  See Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 968-69 (11th Cir. 2008) (concluding that plaintiffs, proceeding individually, cannot prosecute

## B. Retaliatory Discharge Claim

To establish a prima facie case of retaliation, a plaintiff must show: "(1) that [he] engaged in statutorily protected expression; (2) that [he] suffered an adverse employment action; and (3) that there is some causal relationship between the two events." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007).

In March or April 2003, Watkins's complained to Human Resources Specialist Barton about not receiving a promotion when he was temporarily assigned to Key West Airport and told her he planned to file an EEO complaint after his probationary period expired. The parties do not dispute that (1) this evidence satisfied Watkins's burden to show he engaged in statutorily protected expression, and (2) Watkins suffered an adverse employment action when Chevalier terminated him on August 29, 2003. Thus, the only issue is whether Watkins presented evidence of a causal connection between his conversation with Barton and his termination approximately three or four months later.

While causation can be established "by showing close temporal proximity between the statutorily protected activity and the adverse employment action," without additional evidence, temporal proximity "must be very close" and "[a] three to four month disparity . . . is not [close] enough." Id. at 1364 (internal

Title VII pattern or practice claims for injunctive or declaratory relief).

15

quotation marks omitted). Furthermore, "temporal proximity alone is insufficient to create a genuine issue of material fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) (involving FMLA retaliation claim and citing Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1355-56 (11th Cir. 1999), which involved a Title VII retaliation claim).

Construing the evidence in the light most favorable to Watkins, his phone call to Barton occurred at the end of May 2003. Given that at least three months separated Watkins's conversation with Barton and his August 29, 2003 termination by Chevalier, Watkins cannot rely solely upon temporal proximity to show causation.

More importantly, Watkins did not refute the testimony of the supervisors in his chain of command (including Cassell, who initiated the termination process, and Chevalier, who concluded it) that they were unaware of his conversation with Barton or his plans to file an EEO complaint of race discrimination. On the summary judgment record, only Barton knew of Watkins's threat to file an EEO complaint, and Barton's knowledge cannot be imputed to Watkins's supervisors. See Brungart, 231 F.3d at 799-800 (declining to adopt an "imputed knowledge"

16

theory that knowledge possessed by others is imputed to a decision maker).

Moreover, Watkins presented no evidence that Barton influenced any of the supervisors involved in the decision to terminate him. See Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999) (explaining the "cat's paw" theory of causation, in which "the plaintiff shows that the decisionmaker followed the biased recommendation [of a non-decision maker] without independently investigating the complaint against the employee" and the "recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus").

As a Human Resources Specialist, Barton received the paperwork from Watkins's supervisors documenting his absences and AWOL status and recommending his termination. Barton then forwarded this information on to upper-level management, Cruz and Chevalier, for action. Once Chevalier decided to terminate Watkins, she also prepared the documents relating to Watkins's termination. Watkins presented no evidence that Barton's role in the termination was anything other than administrative. Thus, Watkins did not present evidence of a causal link between his protected expression and his termination.

Watkins argues that he presented evidence that: (1) another TSA screener named "Charlene" also had a history of excessive absences between March and

17

July 2003, but was not terminated until December 2004;[9] (2) his supervisors did not follow the progressive discipline outlined in TSA's attendance policy before terminating him; and (3) his supervisors had already recommended his termination for being AWOL on July 29, 2003, when in fact he had been given leave for his absences up to that point. This evidence seems more appropriately evaluated at the pretext stage of the McDonnell Douglas test, an issue we do not reach if the plaintiff fails to meet his initial burden of establishing a prima facie case. See Olmstead v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998) (explaining that after the plaintiff has established a prima facie case of retaliation, the employer must articulate a legitimate, non-retaliatory reason for the adverse action, which the plaintiff must then show was pretext).

Even assuming this evidence is relevant, it is insufficient to show causation. As to Watkins's comparator evidence, Watkins did not present evidence that Charlene was similarly situated to Watkins. See Anderson v. WBNG-42, 253 F.3d 561, 564 (11th Cir. 2001) (explaining that for comparator employees to be

_____

[9]While in Key West, Watkins worked with another screener, Charlene. Watkins stated that Charlene was always sick, but he did not know Charlene's last name. Watkins estimated that after Watkins and Charlene returned to FLL, Charlene missed at least half of her work days between March and July 2003. However, Charlene was not terminated. Watkins did not know what medical condition Charlene suffered from or whether Charlene provided doctor's notes to her supervisors. Kelly Lecourse, a TSA Human Resources Specialist, averred that the only female TSA employee at FLL named Charlene was terminated for excessive absenteeism in December 2004.

18

similarly situated they must have engaged in or be accused of the same or similar misconduct). While both Charlene and Watkins had a history of excessive absences, Watkins was terminated for being AWOL from August 10 through August 29. Watkins did not present any evidence that Charlene was ever AWOL. Thus, the evidence that TSA supervisors tolerated Charlene's excessive absences longer than they tolerated Watkins's excessive absences does not support a finding of causation.

Likewise, Watkins did not show that his supervisors violated TSA's attendance policy by terminating him for being AWOL rather than using progressive discipline. This argument ignores the fact that, on August 17, Cassell instructed Watkins that he could not call in sick to the Operations Center and needed to provide documentation before taking any further leave. Yet, Watkins never returned to work or provided a doctor's note indicating he could not return to work. Although Watkins confirmed that Cassell had called his doctor's office, he did not confirm that his doctor provided Cassell the required documentation. It is undisputed that Cassell never received any other doctor's notes.

Even under Watkins's version of the facts, he was AWOL as of August 17. By August 29, when Chevalier terminated him, Watkins had been AWOL almost two weeks. While the Attendance Control Policy generally provides for

19

progressive discipline, an employee who is AWOL three or more times must be reported up the chain of command with a recommendation for formal disciplinary action, which may include termination. Thus, Watkins's termination without first resorting to progressive discipline did not violate the attendance policy.

Finally, Watkins points to the July 29, 2003 Disciplinary Procedure Request Form recommending that Watkins be terminated for being AWOL when Chevalier's August 29, 2003 termination memorandum states that Watkins was given sick leave or annual leave in lieu of sick leave for all of his absences up to August 7, 2003. However, Chevalier explained that, even if Watkins was not technically AWOL on July 29, 2003, Watkins's supervisors had detected ongoing attendance problems by that date and he ultimately terminated Watkins for being AWOL only after August 8, 2003.

Because Watkins did not present evidence from which a reasonable jury could find a causal relationship between his protected expression and his termination, the district court properly granted the defendants summary judgment on Watkins's retaliation claim.

**AFFIRMED.**